JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

14 5286

## I. (a) PLAINTIFFS

Dr. Pamela K. Erdman, M.D.; Dr. Pamela K. Erdman, M.D., Inc.; Benjamin Fradlin; Faina Fradlin; and Engineered Systems and Products, Inc.

**(b)** County of Residence of First Listed Plaintiff    DeKalb County, Georgia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorney's *(Firm Name, Address, and Telephone Number)*
Ira Silverstein, Esq.
Feldman Morgado, PA
140 Broadway, 46th Floor, Suite 4624
New York, NY 10005

## DEFENDANTS

American General Life Insurance Companies, LLC; John J. Koresko, V.; Lawrence Koresko; Lee Phillips; Clark S. Gardner; Koresko Financial LP; PennMont Benefits, Inc.; Sammons Securities Co., LLC; John Doe Companies 1-50

County of Residence of First Listed Defendant    Harris County, Texas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government   Plaintiff
- ☐ 2   U.S. Government   Defendant
- ☒ 3   Federal Question     *(U.S. Government Not a Party)*
- ☐ 4   Diversity     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☒ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☒ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 USC Sec. 1001

Brief description of cause:
Claims for breach of fiduciary duty and fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE   McLaughlin     DOCKET NUMBER   2-09-cv-988-MAM and others

DATE
9/16/2014

SIGNATURE OF ATTORNEY OF RECORD

SEP 16 2014

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

14      5286

Address of Plaintiff: All Plaintiffs, c/o Ira Silverstein, Feldman Morgado PA, 140 Broadway, 46th Fl. New York, NY 10005

Address of Defendant: American General c/0 CT Corporation System, 401 Liberty Ave, Pittsburgh, PA 15222

Place of Accident, Incident or Transaction: Montgomery County, PA

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))       Yes☐   No☑   **UNKNOWN**

Does this case involve multidistrict litigation possibilities?       Yes☐   No☒

*RELATED CASE, IF ANY:*
Case Number: 2-09-cv-988-MAM       Judge McLaughlin       Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
       Yes☒   No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
       Yes☒   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?       Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
       Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
    (Please specify) Employee Retirement Income Security Act

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*
I, Ira B. Silverstein, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: 9/16/2014 _____ Attorney-at-Law _____ Attorney I.D.# 17658

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

SEP 16 2014

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____ _____ Attorney-at-Law _____ Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

Dr. Pamela K. Erdman, M.D.; Dr. Pamela K. Edrman M.d.,
Inc.; Benjamin Fradlin; Faina Fradlin; Engineered Systems
and Products, Inc.
　　　　　　　　　　　　v.
American General Life Insurance Companies, LLC; John J. Koresko, V.;
Lawrence Koresko; Lee Phillips; Clark S. Gardner; Koresko Financial LP;
PennMont Benefits, Inc.; Sammons Securities Co., LLC; and John Doe
Companies 1-50.

CIVIL ACTION

**1 4          5 2 8 6**

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
　　and Human Services denying plaintiff Social Security Benefits.　　　　　　　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
　　exposure to asbestos.　　　　　　　　　　　　　　　　　　　　　　　　　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
　　commonly referred to as complex and that need special or intense management by
　　the court. (See reverse side of this form for a detailed explanation of special
　　management cases.)　　　　　　　　　　　　　　　　　　　　　　　　　　　　( X )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　　　( )

| 9/16/2014 | | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 212-991-8431 | 212-991-8439 | isilverstein@fmlawgroup.us |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

SEP 16 2014

SEP 16 2014

THIS CASE IS RELATED TO:  09cv 988

**CIVIL ACTION NO.**
**CRIMINAL NO.**

**ASSIGNED TO:** MAM

---



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DR. PAMELA K. ERDMAN, M.D., in her
individual capacity and in her capacity as a
participant in and fiduciary of the Pamela K.
Erdman, M.D., Inc., Health and Welfare
Benefit Plan,

and

DR. PAMELA K. ERDMAN, M.D., INC.,

and

BENJAMIN FRADLIN, in his individual
capacity and in his capacity as a participant in
and fiduciary of the Engineered Systems and
Products, Inc., Health and Welfare Benefit
Plan,

and

FAINA FRADLIN, in her individual capacity
as a participant and beneficiary of the
Engineered Systems and Products, Inc., Health
and Welfare Benefit Plan,

and

ENGINEERED SYSTEMS AND
PRODUCTS, INC.,

        *Plaintiffs*,
v.

AMERICAN GENERAL LIFE INSURANCE
COMPANIES, LLC

and

JOHN J. KORESKO, V,

**14      5286**

**CIVIL ACTION NO:**

**JURY TRIAL DEMANDED AS TO**
**ALL NON-ERISA CLAIMS**

1

and

LAWRENCE KORESKO,

and

LEE PHILLIPS,

and

CLARK S. GARDNER,

and

KORESKO FINANCIAL LP,

and

PENNMONT BENEFITS, INC.,

and

SAMMONS SECURITIES CO., LLC,

and

John Doe Companies 1-50,

      *Defendants.*

## **COMPLAINT**

      Plaintiffs, Dr. Pamela K. Erdman, M.D., Dr. Pamela K. Edrman, M.D., Inc., Benjamin Fradlin, Faina Fradlin, and Engineered Systems and Products, Inc., hereby bring this Complaint against defendants American General Life Insurance Companies, LLC, John J. Koresko V., Lawrence Koresko, Lee Phillips, Koresko Financial, LP, PennMont Benefits, Inc., Sammons Securities Co., LLC, and John Doe Companies 1-50.

2

Plaintiff Dr. Pamela K. Erdman sues in her individual capacity and in her capacity as a participant in and fiduciary of the Dr. Pamela K. Edrman, M.D., Inc. Health and Welfare Benefit Plan. Plaintiff Benjamin Fradlin sues as in his individual capacity and in his capacity as a participant in and fiduciary and beneficiary of the Engineered Systems and Products, Inc., Health and Welfare Benefit Plan. Plaintiff Faina Fradlin sues in her individual capacity as a participant in and beneficiary of the Engineered Systems and Products, Inc., Health and Welfare Benefit Plan.

## PRELIMINARY STATEMENT

1.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or "the Act"), 29 U.S.C. § 1001 *et seq*. It is brought pursuant to § 502(a)(3) of the Act to obtain appropriate equitable relief and pursuant to § 502(a)(2) of the Act to remedy breaches of fiduciary duties. Alternatively, should it be determined that ERISA is inapplicable, Plaintiffs seek equitable relief and damages under state law.

2.      Plaintiffs also assert:

   a.      Common law claims for fraud and conspiracy for actions by defendants prior to the establishment of the Dr. Pamela K. Erdman, M.D., Inc., Health and Welfare Benefit Plan ("Erdman WBP") and the Engineered Systems and Products, Inc., Health and Welfare Benefit Plan ("Engineered WBP") (collectively, "Plaintiffs' WBPs"); and

   b.      Claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO").

3.      Plaintiffs are victims of a long-term scam organized and operated by Defendant John J. Koresko V. ("Koresko"). The scam enticed employers to purchase cash-value life insurance policies on the lives of their principals through a trust arrangement. The employers

3

were assured that the arrangement would (i) permit them to deduct the insurance premiums as business expenses (ii) accumulate cash value in the policies through investment returns that the employers could access at any time by terminating their involvement in the arrangement, and (iii) provide a death benefit to the employees' designated beneficiaries equal to the face amount of the policies.

4.      In reality, the sole beneficiaries of the arrangement were Koresko, his brother Lawrence, the entities they controlled (collectively, "the Koresko Parties") and the brokers, financial institutions and insurance companies that assisted the Koresko Parties in marketing the arrangement.

5.      Victims, such as the plaintiffs,

a.      Have been deprived access to any information concerning the status of the life insurance policies;

b.      Have been denied the right to access the cash-value or the life insurance policies themselves if they choose to terminate their involvement in the arrangement;

c.      Have discovered:

i.      Insurance companies, such as defendant American General Life Insurance Companies, LLC, have permitted the Koresko Parties to withdraw cash value from the policies through unauthorized loans and surrenders;

ii.      The Koresko Parties engage in various pretexts to deprive beneficiaries of the proceeds of the life insurance policies in the event of the death of an insured; and

iii.      The Koresko Parties have embezzled trust assets through self-dealing and out-and-out conversion.

4

6.      The complex scam perpetrated by the defendants and the others shall be referred to herein as the "Arrangement" or the "REAL VEBA Arrangement."

## PARTIES

7.  Plaintiffs are:

a.      Dr. Pamela K. Erdman, M.D., as a participant in and fiduciary of the Dr. Pamela K. Edrman, M.D., Inc. Health and Welfare Benefit Plan ("Erdman WBP"). Dr. Erdman is a citizen of the State of Georgia;

b.      Pamela K. Erdman, M.D., Inc., ("Erdman Inc."), a Georgia corporation organized and existing under the laws of Georgia with its principal place of business in Stone Mountain, Georgia. Erdman Inc. is the sponsoring employer of the Erdman WBP. Erdman Inc. made over $400,000 in contributions to the Erdman WBP;

c.      Benjamin Fradlin, as a participant in and fiduciary and beneficiary of the Engineered Systems and Products, Inc., Health and Welfare Benefit Plan ("Engineered WBP"). Mr. Fradlin is a citizen of the State of Maryland;

d.      Faina Fradlin, as a participant in and beneficiary of the Engineered WBP. Mrs. Fradlin is a citizen of the State of Maryland;

e.      Engineered Systems and Products, Inc. ("Engineered"), a Maryland corporation organized and existing under the laws of Maryland with its principal place of business in Owings Mills, Maryland. Engineered is the sponsoring employer of the Engineered WBP. Engineered made approximately $500,000 in contributions to the Engineered WBP.

8.      The defendants are:

5

a.      American General Life Insurance Companies, LLC ("American General"),

a Delaware limited liability company with its principle place of business at 2727-A Allen

Parkway, Houston, Texas 77251. At relevant times, American General was a fiduciary of

the Plaintiffs' WBPs and authorized the other defendants to act as its agent in selling life

insurance policies. At all relevant times, American General had actual, constructive or

imputed knowledge of the nature of the Arrangement and exercised discretionary control

over the assets of the Plaintiffs' WBPs including, but not limited to, the cash value of the

insurance policies on the lives of the Plaintiffs' WBPs' participants.

b.      John J. Koresko, V ("Koresko"), a Pennsylvania citizen and an attorney

currently suspended from the practice of law in Pennsylvania. Koresko is sued in his

individual capacity and as a fiduciary of the Plaintiffs' WBPs. He and his brother

Lawrence are the controlling parties of the Koresko Entities. At all relevant times,

Koresko was an agent of the defendant American General.

c.      Lawrence Koresko, a Pennsylvania citizen, and one of the principals of the

Koresko Entities. At all times relevant to this complaint Lawrence Koresko was an agent

of the defendant American General. Lawrence Koresko is sued in his individual capacity

and as a fiduciary of the Plaintiffs' WBPs in that he exercised discretionary control over

the Plaintiffs' WBPs' assets.

d.      Lee Phillips, a Utah citizen and an attorney, insurance broker, and

financial planner who acted as an agent of the Koresko Parties and defendant American

General in marketing and selling the Arrangement to the plaintiffs. Mr. Phillips also acted

as plaintiffs' attorney and advisor in connection with their decision to enter the

Arrangement.

6

e.      Clark S. Gardner, a Utah citizen and insurance agent and broker who acted as an agent of the Koresko Parties and Defendant American General in marketing and selling the Arrangement to the plaintiffs.

f.      Koresko Financial LP ("Koresko Financial"), a Pennsylvania limited partnership with its principal place of business in Bridgeport, Pennsylvania. Upon information and belief, Koresko Financial was the vehicle through which John and Lawrence Koresko were paid commissions by the insurance companies that participated in the Arrangement.

g.      PennMont Benefits, Inc., a Delaware corporation with its principal place of business at the same address as Koresko Financial. PennMont Benefits, Inc. is the general partner of Koresko Financial and its officers are John and Lawrence Koresko.

h.      Sammons Securities Co., LLC ("Sammons"), a Delaware limited liability company with its principal place of business in Ann Arbor, Michigan. Sammons acted as an agent of the Koresko Parties and defendant American General Life in selling the Arrangement to the plaintiffs.

i.      The true names and capacities of defendants DOES 1 through 50, inclusive, are presently unknown to plaintiffs, and such defendants are sued under fictitious names until their identities are learned, at which time leave to amend will be requested. Upon information and belief, these defendant DOES include other individuals and/or business entities that currently possess and/or maintain the funds reaped by Koresko – both the money taken from plaintiffs' policies and money paid to Koresko by Defendant American General as commissions for selling American General life insurance policies.

7

9.    Relevant Parties Not Formally Joined are:

a.    The Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Trust (the "REAL VEBA"), an entity created by the Koreskos to serve as a trust for the purposes of the Arrangement. The REAL VEBA is currently a Chapter 11 debtor-in-possession;

b.    The Single Employer Welfare Benefit Plan Trust (the "SEWBPT"), another entity created by the Koreskos to serve as a trust for the purposes of the Arrangement. The SEWBPT is currently a Chapter 11 debtor-in-possession;

c.    Penn Public Trust ("PPT"), a Pennsylvania corporation with its principal place of business in Bridgeport, Pennsylvania, and currently a Chapter 11 debtor-in-possession. At relevant times, PPT was the trustee of the REAL VEBA and the SEWBPT until September 2013, when the U.S. District Court for the Eastern District of Pennsylvania appointed an Independent Fiduciary to administer the REAL VEBA and SEWBPT.

d.    PennMont Benefit Services, Inc. ("PennMont"), a Pennsylvania corporation and currently a Chapter 11 debtor-in-possession with its principal place of business at the same address as Koresko Financial. PennMont was the Plan Administrator of the Plaintiffs' WBPs.

e.    Koresko & Associates, P.C. and its successor, the Koresko Law Firm (collectively, "The Koresko Law Firm"), a Pennsylvania professional corporation and currently a Chapter 11 debtor-in-possession with its principal place of business at the same address as Koresko Financial. The Koresko Law Firm provided plan administration services to the Plaintiffs' WBPs through PennMont, as PennMont had no employees.

8

10.     Upon information and belief, at all relevant times, each of the defendants, including DOES 1 through 50, inclusive, and each of the relevant parties listed in paragraph 16, above:

      a.     Were the agents, partners, servants, employees, representatives, subsidiaries, members, alter egos, aider and abettors, and/or co-conspirators of the others in connection with the acts hereinafter mentioned;

      b.     Were acting within the course and scope of such relationship, and with the knowing assistance and active participation of each other; and/or

      c.     Ratified each act, omission, or activity done by each of the other defendants.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to § 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).  Alternatively, this Court has jurisdiction pursuant to 18 U.S.C. § 1964(c) ("RICO") and pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

12.     Venue is appropriate in the Eastern District of Pennsylvania as the Plaintiffs' WBPs are administered in the district, all of the defendants reside or conduct business within the district, a substantial part of the events or omissions giving rise to the claim occurred in the district and a substantial part of property that is the subject of the action is situated in the district.

## OPERATIVE ALLEGATIONS

### Background of The Arrangement

13.     The REAL VEBA and the SEWBPT are currently under the control of an
Independent Fiduciary ("IF") appointed by this Court in a related case, *Solis v. Koresko et al.*,
2:09-cv-00988-MAM.  The allegations that follow describe the state of affairs prior to the IF's
appointment in September 2013.

14.     The Koresko Parties are a group of interrelated entities together with their
principals.  The entities were all created and established by Koresko as an entrepreneurial vehicle
designed to take advantage of § 419(A)(f)(6) of the Internal Revenue Code ("IRC" or "Code"), a
section of the Code that exempts certain benefit plans from some of the restrictions on the
deductibility of employee benefit expenditures.

15.     Prior to the passage of §§ 419 and 419A of the IRC in 1984, expenditures for
employee benefits were deductible under IRC § 162. *See Greensboro Pathology Associates, P.A.
v. United States*, 698 F.2d 1196 (Fed. Cir. 1982).  Sections 419 and 419A placed substantial
limitations on the deductibility of these expenses; however, Congress saw fit to carve out an
exception for "10 or more employer plans."  For "10 or more employer plans," the newly
adopted limitations did not apply. IRC, § 419A(f)(6).

16.     Though the language of § 419A(f)(6) is deceptively simple, the scope and
applicability of the § 419A(f)(6) exception to the general § 419 limitations on the deductibility of
expenditures for employee benefits has long been a subject of dispute. The Code itself states only
that to come under the § 419A(f)(6) exception more than one employer must contribute to the
plan, no employer may normally contribute more than 10% of the total and the plan may not

maintain "experience-rating arrangements with respect to individual employers." IRC, §
419A(f)(6).

17.    In 1995, the Service issued Notice 95-34 to "alert taxpayers and their
representatives to some of the significant tax problems that may be raised by [trust] arrangements
[which claim to satisfy § 419A(f)(6)]." The notice advised that such arrangements might not
satisfy § 419A(f)(6) if they are actually providing deferred compensation, if they are in fact
separate plans maintained for each employer, or if they are experience-rated.

18.    The issues raised by Notice 95-34 were parsed in *Booth v. C.I.R.*, 108 T.C. 524
(U.S. Tax Ct. 1997). The Tax Court, while disagreeing with the Commissioner's view that the
plan in *Booth* was actually one of deferred compensation, found the plan did not satisfy
§ 419A(f)(6) because it maintained separate accounts for each employer and the employees
could only look to their employer's account to pay benefits. Hence, the court reasoned, the plan
was actually an amalgamation of separate plans. Moreover, the court found that the arrangements
had the effect of adjusting benefits based on prior experience and, therefore, the plan was an
experience rating arrangement. As a consequence, the *Booth* plan did not satisfy § 419A(f)(6).

19.    Koresko and other entrepreneurs sought to take advantage of § 419(A)(f)(6) by
marketing "plans" that claimed to come under the § 419(A)(f)(6) exception to the limitations on
the deductibility of welfare benefit expenditures (hereinafter "419A(f)(6) plans"). Koresko's plan
attempted to offer a death benefit through the purchase of cash value life insurance.

20.    As the cost of cash value life insurance is far more expensive than term insurance
with an equal face value, the dilemma faced by Koresko was, on the one hand, to market a plan
that gave company owners the belief their investment was safe and that they would get the
benefit of the much higher premiums they would pay for the cash value policies on their own

11

lives while, at the same time, presenting a façade to the IRS so Koresko could argue his plan did

not suffer from the same flaws as the *Booth* plan.

**The Arrangement as Advertised**

21.     Through Koresko's PennMont website, his Arrangement is touted as having the

following "advantages":

- Contributions are tax-deductible and assets accumulate and compound on a tax-deferred basis.

- Assets can be protected from creditors.

- Benefits can be paid from the plan before age 59 ½ or after 70 ½ with no penalties.

- Employees are not "vested" with respect to benefits.

- Survivor benefits can be free of all income taxes and estate taxes.

- Contributions and benefits are based upon sound and conservative actuarial assumptions.

- Plan assets are held by an independent corporate trustee and a major insurance company.

- The plan prohibits any reversion of assets to the employer.

- The plan can be amended or terminated by the employer at any time.

22.     The purchase of life insurance as the underlying purpose of the Arrangement is

made clear on the website and PennMont's marketing is directed primarily at "insurance agents,

financial planners, attorneys and accountants."

> PennMont's goal is to provide insurance agents, financial planners, attorneys and accountants with a working knowledge of cutting-edge legal developments in the area of employee welfare benefits, including the design, installation and maintenance of an employee welfare benefit plan as funded through life insurance; the fundamentals of estate planning; and issues governing corporate taxation.

PennMont website, "About PennMont", *available at*
http://pennmont.com/modContentDisplay.php?ContentID=15 (last accessed
September 10, 2014 at 10:53am).

23.     The website also explains "why life insurance products fit a VEBA," claims that
"life insurance products may be the only choice for MEWAs,"[1] and describes the Arrangement
as a way to "acquire tax-deductible life insurance." It even includes graphic diagrams showing
how a VEBA acts as a pass through for life insurance premiums paid by company owners to a
life insurance company and a return pass through for the death benefits paid by the life insurance
company to the owners.

24.     In addition to the website, Koresko markets his Arrangement to financial
professionals through seminars at which Koresko promises to teach the attendees to "show your
client how to: . . .Turn life insurance premiums into tax deductions."

25.     The marketing materials on the PennMont website contain numerous
representations that are misleading at best. In touting the supposed security of an investment in
the VEBA, PennMont claims an "Independent 3rd party trustee (** Multi billion dollar bank),"
"ERISA bonds," "VEBA plan administrator," and "Financial professionals." In fact, as will be
discussed in more detail below:

- The trustee was, at various times, either a directed trustee with absolutely no independence or an entity owned and controlled by Koresko.

- Mr. Koresko insists that his Arrangement is not governed by ERISA and no bonding company has ever been identified.

- The "VEBA plan administrator" is PennMont, an entity with no employees and operated and controlled by Koresko.

26.     The website further states: "PennMont is comprised of attorneys, accountants,
pension specialists, financial consultants and insurance practitioners. The law firm of Koresko &

---

[1] Multiple Employer Welfare Arrangements.

Associates, P.C, provides counsel to PennMont." In fact, PennMont has no employees and all PennMont activity is performed by employees of the Koresko law firm.

27.     The website misleads as to other crucial aspects of the REAL VEBA Arrangement, at least the Arrangement as interpreted by Koresko. In an FAQ section, potential customers are led to believe they can access their "VEBA money" at any time through a plan amendment or plan termination as it notes:

> **CAN I ACCESS VEBA MONEY IN THE EVENT OF AN EMERGENCY?**
>
> Yes. The plan can be amended or terminated at any time.

28.     They are also told: "If termination does occur, all assets are allocated to those employees who where actively participating on the date of termination. Distribution is made pro rata, in proportion to each employee's cumulative compensation during years of participation in the plan."

29.     Customers are also given verbal assurances that they can terminate at any time and withdraw their funds. In the event, however, if a customer does decide to terminate, Koresko insists they will forfeit their investment.

30.     The website also tells potential customers that all cash value gains within the life insurance policies will be used only for the benefit of the plan beneficiaries. "The trustee will use all available assets to provide the benefits to eligible employees. One asset is the accumulated cash value of life insurance policies." In fact, the "trustee" is effectively Koresko and he interprets the documents as granting him full discretion to use the assets as he sees fit.

31.     The website implies that PennMont will design a plan specifically tailored to a customer's needs. It boasts:

14

> [PennMont] offers turnkey design, installation and administration
> of qualified retirement plans and other welfare benefit trusts.
>
> * * *
>
> From design through distribution, PennMont's attorneys and
> financial advisors work closely with clients and their consultants to
> deliver quality service and solve problems.

32.     In fact, Koresko studiously avoids meeting his customers and only offers a pre-

packaged Arrangement that customers must accept *in toto*.

33.     In short, these are true contracts of adhesion.

**The Arrangement as Advertised**

34.     The defendants provided some or all of the following advertisement materials to

the plaintiffs to induce their participation in the Arrangement.

**The Q&A Brochure**

35.     In addition to the website, PennMont provides potential participants with a thirty-

six (36) page pamphlet, titled "The VEBA – Understanding Multi-employer Voluntary

Employees' Beneficiary Associations," authored by John Koresko.  The pamphlet is in the form

of seventy-one (71) questions and answers ("Q&As") and is a promotional pamphlet for the

REAL VEBA Arrangement.

36.     The pamphlet contains numerous representations that the purchase of cash value

life insurance through the REAL VEBA Arrangement will benefit owner/employees and that the

investment returns on the cash value will be for the owner/employee's benefit.

37.     For example:

   a.   In answer to Question 1, "Why should a business adopt a Voluntary Employees'
        Beneficiary Association Health and Welfare Plan?," the Koresko Parties state:

15

A VEBA is one of the last, best, legal tax shelters available. A business is allowed a current deduction for IRS contributions to the plan; in most cases, the employee pays no tax on money contributed for his or her benefit until benefits are received; cash value within the insurance policy accumulates tax free and is protected from creditors' claims; and distributions from the plan may be afforded favorable tax treatment.

A VEBA is especially attractive to working owners of closely held corporations and self-employed persons. Their long-term service with their companies gives them the best opportunity to accumulate large benefits through tax-free build-up of capital. Although benefits must be provided to other employees as well, the owner usually receives a much larger benefit than other employees.

b.  In answer to Question 7, "What are the basic tax advantages of a VEBA?," the Koresko Parties state, in part: "Earnings of the VEBA are generally exempt - permitting tax-free accumulations of income and gains on cash value within the insurance policies" and "In contrast to the general rules barring a company from taking deductions for permanent life insurance coverage, the employer gets a deduction for insurance benefits provided by the VEBA."

c.  In answer to Question 20, "How much am I obligated to contribute to the VEBA each year?," the Koresko Parties state:

> The plan is extremely flexible. After the initial first year contribution, your business must contribute just enough to keep any insurance policies for death and other benefits in force. All contributions, however, must be made by the end of the year to be deductible for that year.
> Keep in mind that the higher the initial contributions, the faster your investment grows. Thus, it is advantageous to contribute as much as possible in the early years! (emphasis added).

d.  In answer to Question 32, "What happens to the cash value in the life insurance policies upon plan termination?," the Koresko Parties state:

> The cash value is paid out to current plan participants in the proportion that their total compensation while participating in the plan bears to the total compensation paid to all of the participants in the VEBA at the time of termination.
>
> Obviously, the participating employees who have earned a higher percentage of income would receive a higher percentage of plan assets upon termination. Upon plan termination, benefits distributed are taxable to the participants at ordinary rates.

16

e.  In answer to Question 33, "Can the cash value in the life insurance policies be used for other VEBA benefits?" the Koresko Parties answer: "Of course. The cash value, a.k.a. side fund functions as the source for all other benefits. In particular, the side fund will support the severance benefit, if elected."

f.  In answer to Question 47, "Are account balances subject to loss for an investment risk or market fluctuations?," the Koresko Parties state:

> To the extent life insurance policies are used in the plan, account values are guaranteed by a life insurance company. However, if you decide to use interest sensitive or mutual fund based products, investment risk and market fluctuations may affect the plan balances.

g.  In answer to Question 61, the Koresko Parties describe how the cash- value will be distributed primarily to the owner/employee if the employer decides to terminate.

38.   The pamphlet also makes clear that the owner of the company is deciding with his insurance agent what type of life insurance the Arrangement should purchase. In providing an example of how the Arrangement works, the Koresko Parties posit a Mr. X, who owns a business and a Joe Honest, Mr. X's insurance agent/financial advisor. Joe introduces Mr. X to PennMont and after Mr. X decides to enter into the REAL VEBA Arrangement:

> [Mr. X] asked Joe to obtain a cash value policy for himself and term insurance for the other participants. Mr. X informed Joe that he desired to shelter $100,000 in the VEBA before year end. Mr. X asked Joe to determine if that was permissible.
>
> Joe submitted a Proposal Request form to Penn-Mont Benefit Services. Penn-Mont produced a proposal which illustrated potential tax savings, a death benefit for employee (A) for $450,000; (B) for $250,000 and (C) for $300,000, and a $1.5 million death benefit for Mr. X, the owner/employee; and a cash value build-up which would be used to pay severance benefits or distributed to the participants upon plan termination.
>
> Pleased with the result, Mr. X forwarded a check in the amount of $100,000 payable to Commerce Bank, N.A., the trustee, before December 31. After clearance of the check, the corporation, trustee, and employees completed the life insurance applications

on behalf of Mr. X and employees A, B and C. After approval, the
trustee paid the premiums.

Pamphlet, pp. 27-28.

### The 1996 Journal Article

39.     To convince individuals to participate in the REAL VEBA Arrangement the

Koresko Parties also provided a print out of a 1996 article Koresko published in a journal called

"Taxation For Accountants." The article is a thinly disguised promotion of Koresko's VEBA

Arrangement.

40.     The article informed the plaintiffs that purchasing cash value life insurance

through the REAL VEBA Arrangement had the following benefits:

> Aside from assuring current and long-term protection, cash-value
> insurance serves the secondary purpose of providing a source for future
> benefits that are funded with today's deductible dollars. This tax-
> deductible benefit is then integrated into the client's estate plan for
> maximum effectiveness. It is important to understand that the death
> benefit is probably more than most people would purchase for themselves
> using after-tax dollars.

Taxation For Accountants, December 1996, p. 336.

41.     The article also represented that an employer could withdraw from the

Arrangement at any time and obtain the accumulated cash value, Id. at 337, and that "a plan can

be designed to make all assets available [for all claims], while still effectively minimizing the

probability of invasion by other employers in the plan." Id. at 338.

### The Arrangement as Documented

42.     An employer who falls into Koresko's trap executes The Regional Employers'

Assurance Leagues Voluntary Employees' Beneficiary Association Health and Welfare Benefit

Plan Adoption Agreement (the "Adoption Agreement"). By doing so, the employer creates his

18

own "plan" (see Adoption Agreement, § 2(a)) based on the terms of the Regional Employers'

Assurance Leagues Voluntary Employees' Beneficiary Association Health and Welfare Benefit

Plan Document (the "Plan Document").

43.     Per the Adoption Agreement, the employer adopts the Plan Document, see

Adoption Agreement preface, and "that certain Trust Agreement known as The Regional

Employers Assurance League Voluntary Employees' Beneficiary Association Trust" (the "Trust

Agreement").

44.     The Adoption Agreement provides various types of supplemental plan

characteristics to be plugged into the Plan Document.  The end result is a complex of cross-

referenced documents that are contradictory and misleading and ultimately so confusing as to be

meaningless.  A few examples follow.

**Plan References to Insurance**

45.     The documents contain numerous references to the insurance policies, which are

its raison d'être.  Section 4.04 of the Plan Document provides that contributions and earnings

from the contributions shall be used to pay the life insurance premiums, though even this simple

provision is expressed as obliquely as possible. First, the clause is written in the hypothetical, i.e.

it applies only if the Adoption Agreement calls for the purchase of insurance, even though

Koresko does not run any plans that are not based on insurance. Second, it refers to the insurance

policies as "Contracts." Contract is a defined term that means an insurance policy.  However, §

4.04(b) makes it rather clear that all benefits are to be funded by life insurance policies,

providing that if insurance is not purchased, the death benefit is limited to the sum of the

premiums paid.

46.     In choosing to have an insurance policy purchased – though it isn't really a choice – the adopting employer designates a funding policy in the Adoption Agreement. The triggering designation is "fully insured." That this is not a real choice is manifest from the Trust Agreement that all employers must also adopt. It provides that no investments can be made "which would cause the Plan not to be considered "fully insured" within the meaning of ERISA Section 514." By its terms, the Trust Agreement controls over any conflicting terms in an employer's plan.

47.     The insurance provisions also belie Koresko's pretense that the assets of the Trust are available to fund any employee's benefits. Section 7.05(g) of the Plan Document incorporates the terms of the purchased insurance policy into the terms of the plan and provides that:

> [N]o benefit which is funded or intended to be funded by a policy or Contract shall be payable to any Participant or Beneficiary unless or until amount the (sic) payable under such policy or contract is received by the Trust. For purposes of this Plan and Trust, all benefits shall be deemed to be funded by a policy or contract unless the Employer shall notify the Administrator and Trustee in writing of its election to the contrary.

48.     Since every benefit is to be funded by a life insurance policy, this means no benefits are paid unless the life insurance proceeds are received, so the "availability" of other assets to fund the benefit is a mirage. No benefits are payable if you would need to tap those other assets.

49.     Yet, when facing an opportunity to seize the insurance proceeds for himself, Koresko views his plan not as being "fully insured" but as giving participants nothing more than an "unsecured promise" of a death benefit.

50.     The Summary Plan Description ("SPD"), further demonstrates the vital nature of insurance policies to the plans. It purports to incorporate the policy terms as terms of the plan

itself, stating: "In all cases, life insurance will be purchased to enable the Plan to provide your Death Benefit.  However, the Plan must follow restrictions placed on it by the issuing insurance company, as well as other limitations."  The section goes on to list "restrictions on life insurance policies [that] are typical of those placed by an issuing insurance company."

51.     Indeed, participating employers such as Erdman Inc., and Engineered were provided yearly mailings described as Census Data Forms identifying the employees and also the face value of the policies taken out on their lives.

**Plan References to Benefits**

52.     Perhaps the most confusing aspect of the Plan Documents and the aspect Koresko takes greatest advantage of is the contradictory and vague language concerning benefit entitlement. The death benefit is defined differently in various parts of the documentation. The SPD puts a maximum limit on the death benefit at an arbitrary multiple of the "Employee's Benefit Base" (some measure of compensation). The multiple is chosen to match the value of the life insurance being purchased.

53.     According to the SPD, the benefit can be paid in four different, vaguely defined ways: " [I]n a lump sum or at the option of the Committee, by one or more of the following methods: (1) Installments for a specified period (for example: 10 years); (2) Installments in a fixed amount until all the Death Benefit (plus interest) is exhausted; or (3) Another optional method provided by the life insurance policy which is held by the Trustee."

54.     Nothing in the SPD suggests the lump sum will be less than the face amount of the insurance proceeds. Since the Committee's three members are chosen by the Employer, the unwary employer naturally assumes this will permit it to distribute the full amount of the insurance proceeds to the beneficiary.

21

55.   The Plan Document does not mimic the SPD. The Plan Document provides:

The "Life Benefit" may be paid in a form of survivor income Benefit to a named Beneficiary or if no Beneficiary is named then to the estate of the deceased Participant. Such Benefit may be payable upon the death of the Participant in a series of monthly payments not to exceed 120 or as otherwise provided in an annuity purchased by the plan or as agreed by the Beneficiary and the Administrator, in the Administrator's sole and absolute discretion.

The Administrator is Koresko acting through PennMont.

56.   This provision of the Plan Document also contradicts the SPD's description of

who gets the benefit.  According to the SPD:

If you do not designate a beneficiary . . . the Plan Committee will determine the beneficiary or beneficiaries from one or more of the following:

1.   Your Spouse;

2.   Your Parents;

3.   Your Child(ren);

4.   Any lineal descendant of any of the above;

5.   A trust created by or for your benefit.

The Plan Committee may change such determination by notifying the Trustee in writing.

If the Committee fails to name a beneficiary or beneficiaries or if all those named have died, your estate will receive the Death Benefit.

57.   Section 5.02(a) of the Plan Document not only contradicts the above quoted

section of the SPD; it is also internally contradictory, as it differs from § 5.06 of the Plan

Document. Section 5.06 provides that:

Upon a Participant's death, Disability or other termination of participation in the Plan:

(a) The Committee shall determine a Beneficiary to whom payment shall be made.

22

(b) The Committee shall have the right to (sic) any time, to designate from the persons indicated below, the Beneficiary to whom payment of the Benefit shall be made. The Committee may designate one or more of the following:

1. Spouse;

2. Parents;

3. Children or lineal descendants of any of the children;

4. A trust created by or for the benefit of a participant;

5. If all of the above shall die prior to the death of the Participant, then the Beneficiary shall be the estate of the Participant, if and only if the Participant has executed a waiver of estate tax consequences in form acceptable to the Committee and Trustee.

6. If any Beneficiary shall die after becoming Entitled to received Benefit (sic) and before distribution is made in full, the estate of such deceased Beneficiary shall become the Beneficiary as to such balance of undistributed Benefit.

Once again, it should be noted that all references to the Committee are, in and of themselves, deceitful as will be explained more fully below.

58.     Finally, the SPD indicates that all applications for benefits under the Plan should be made to the employer, suggesting that the employer has some control or input into the determination of whether benefits will be paid out for valid claims.  This is a blatant misrepresentation, as Koresko, through his self-bestowed and self-interpreted plan powers and through his interrelated entities, insists that he maintains all control as to whether benefits are paid, and he uses that control to deny full payment or sometimes any payment whatsoever.

59.     Perhaps most significantly, a provision of the plan requires payment of death benefits to be made pursuant to the policy of life insurance, regardless of any other provision in the Plan Document or Trust Agreement:

Incorporation into plan – Notwithstanding anything in this Plan and the Trust to the contrary, in the event any benefit provided hereunder is

23

> funded or intended to be funded by a policy or Contract, the terms and
> conditions of such policy or Contract (whether issued or pending via
> application) shall be construed as terms and conditions for the payment of
> the (sic) such benefit.

Thus, one is led to believe that benefits will be paid according to the terms of the policy and the

full face value of that policy will be received by a beneficiary as soon as paid by the carrier.

## Access to Assets in Circumstances Other Than Death

60.    As mentioned above, the Arrangement was advertised as giving the participant

access to his "VEBA money" at any time through plan amendment or termination. Many

provisions of the documents would also lead a reader to believe that the funds the employer was

contributing and earnings on those funds could only be used for the participants' exclusive

benefit and could be removed from the Trust for the employee's benefit even before the

employee's death.

61.    The SPD advises the participant that:

> If you terminate employment with your Employer, you may elect to
> continue coverage. If you elect to continue coverage, you must assume
> responsibility for all subsequent premium payments due on your policy.
> The policy will then be transferred into your name and you will become
> the owner of the policy. This may be a taxable event.

SPD, § 8. Since the insurance policies being purchased on the lives of the highly compensated

employees are cash value life policies, this transfer upon termination of employment transfers

not just the death benefit potential but also the accumulated cash value in the policy.

62.    The SPD also informs participants that they will receive the assets if the plan

terminates. In describing instances in which funds will be invested in assets other than life

insurance, the SPD states: "This may also occur during the period after termination of the Plan

while awaiting distribution of benefits to Plan Participants."

24

63.    The Plan Document contains still additional provisions that would lead the reader

to believe the plans assets will eventually be distributed to him/her.

- "The Plan and Trust shall be created in the United States for the **exclusive Benefit of Employees and their Beneficiaries**." (emphasis added).

- "**It shall be impossible** at any time prior to the satisfaction of all liabilities under the Trust, with respect to the Employees of the Employer and their Beneficiaries, for any part of the corpus, or income of the Trust **to be used for, or diverted to, purposes other than for the exclusive Benefit of such Employees or their Beneficiaries**." (emphasis added).

- "Any and all . . . contributions to this Plan by the Employer [other than an initial contribution attributable to a mistake in fact] shall be irrevocable and neither such contribution **nor any income thereon shall be used for or diverted to purposes other than for the exclusive Benefit of participating Beneficiaries of the adopting Employer**."    (emphasis added).

- "Upon a Participant's death, Disability   or   other   termination   of participation in the Plan: (a) The Committee shall determine a Beneficiary to whom payment shall be made." (emphasis added).

- "Conversion of Policies – Any Policies in effect pursuant to this Plan may contain a provision which shall permit, upon payment of an additional conversion premium, the conversion (without medical examination) of the Policy to provide individual coverage upon termination of Eligibility for coverage under this Plan."

- "Fund Recovery – **it shall be impossible** for any part of the contributions under this Plan to be used for, or diverted to, purposes **other than the exclusive Benefit of the Participants or their Beneficiaries**. (emphasis added).

> (a) Upon dissolution of the Plan and/or termination of the Employee's association from the League by virtue of an Employer's voluntary or involuntary termination of membership in the League, any assets remaining in the Plan after satisfaction of all liabilities to existing Beneficiaries shall be applied in one or a combination of the following, as selected by the Trustee or Plan Administrator in its discretion.

>> (1) Such remaining assets shall be used to provide (either directly or through the purchase of insurance), life, sick, accident or other benefits within the meaning of Regulation Section 1.501(c)(9), pursuant to criteria that do not provide

for disproportionate benefits to officers, shareholders or highly compensated employees of the Employer; or

(2) Such remaining assets shall be distributed to members pro-rata based on the total benefits payable to which such Member and his beneficiaries would be entitled to pursuant to ARTICLE 5 compared to the total benefits payable to which all Members and their beneficiaries would be entitled pursuant ARTICLE 5; or

(3) Distributions shall be based on objective and reasonable standards which do not result in either unequal payments to similarly situated Participants or in disproportionate payments to officers, shareholders or highly compensated employees of the Employer.

(b) In the event an Employer terminates it membership in the League, either voluntarily or involuntarily, any distribution to Employees of such Employer pursuant to Section 9.02(a) shall be made only from the aggregate assets of the Trust constituting the Participant Account(s) attributable to such Employer's Employees. Without limiting the generality of the foregoing, distributions to a particular Participant may be based upon a formula, the numerator of which is all compensation of the Employee during years of participation in this Plan, and the denominator of which is all such compensation for all Employees of the Employer earned during their years of participation.

(emphasis added).

- "[N]o amendment shall: (1) Cause any of the assets of the Trust to be used for or diverted to purposes **other than for the exclusive Benefit of Participants and their Beneficiaries**." (emphasis added).

64.    Lurking within the same document, however, are contradictory provisions that, as interpreted by Koresko, allow Koresko to divert the assets as he sees fit. *See, e.g.*, Plan Document, § 7.05(f) (Insurance policies are owned by Trustee and need not be distributed); § 8.02 (Insurance policies may be valued at $1.00 and changes in cash value need not be reported.); § 8.04 (Statements of account do not give any participant a vested interest in any assets.); § 9.03 (c)(3) (No vesting of any right to any benefit.).

65.    Of greatest significance is a provision within § 9.02 that states:

26

> Nothing herein shall be interpreted to require distribution under Section 9.02(b) of forfeitures or other amounts classified by the Trustee or Plan Administrator as unallocated experience gains or losses for the benefit of the entire Trust; and the determination of amounts distributable hereunder by the Trustee or Plan Administrator shall be final unless determined to be arbitrary and capricious by a court of competent jurisdiction.

Koresko interprets this provision as giving him carte blanche to divert all earnings and insurance proceeds that he determines need not be paid to the beneficiaries.

66.     The Trust Agreement contains similarly misleading language suggesting that beneficiaries will receive the full benefit of assets and insurance policies. *See* Trust Agreement, Eighth Whereas (Trustee holds funds in a fiduciary capacity for the benefit of covered employees); § 1.11 (Plan Administrator the "Named Fiduciary"); § 2.1 (Assets and earnings may not inure to the benefit of anyone except an employee or beneficiary of an adopting employer.); § 2.3 (Trust assets exclusively for the benefit of employees.); § 4.4 (Assets to be divided into separate accounts allocable to employees of each employer.); § 4.5 (If employer becomes ineligible, its allocable assets are to be segregated.); § 4.6 (Earnings may not be used except to pay benefits or permissible compensation.); § 9.1(a) (Amendment may not permit use of assets for any purpose other than the exclusive benefit of covered employees.).

67.     As with the Plan Document, however, the Trust Agreement also contains several other provisions that contradict these terms and purport to provide Koresko with the capability to control and use these assets as he chooses. Trust Agreement, § 2.3 (Restriction on diversion limited to time prior to satisfaction of all liabilities.); § 4.4 (Plan Administrator can reallocate funds credited to specific accounts.); § 4.5 (Segregated assets of ineligible employer to be disposed of as directed by Plan Administrator.); § 5.2 (Trustee has no responsibility other than "to make payments and distributions as directed by the Plan Administrator."); § 5.3 (Trustee must follow direction of the Plan Administrator or Advisory Committee.).

27

68.     Thus, the documents are the epitome of double-talk, and intentionally drafted in such a way as to seduce the reader/participant into believing the marketed expectations while simultaneously providing the Koresko Parties with a textual pretext for defeating those expectations.

**Plan References to Structure and Multiple Entities**

**The Illusory Advisory Committee**

69.     The documents give the impression that an Advisory Committee[2] appointed by the adopting employer will control most of the crucial, discretionary aspects of the plan. For example:

- "Upon proof of death, the Death Benefit will be paid to the beneficiary or beneficiaries in a lump sum or at the option of the Committee by one or more of the following methods." SPD, § 7.

- The Advisory Committee shall have the right to designate beneficiaries and make determinations on payment of benefits as they become due. Plan Document, § 5.06.

- The Advisory Committee has right to enforce the Plan in accordance with its terms, and has responsibility to, inter alia, determine questions of employee eligibility, authorize disbursements by Trustee, and determine applicability of benefits. Plan Document, Article 6.

- The Advisory Committee shall direct the Trustee to take actions on behalf of the Trust. See Trust Agreement, § 5.03.

- "[N]amed Fiduciaries" [defined in Plan Document, § 1.04(r) as the Trustee, Administrator and the members of the Advisory Committee] shall meet no less than annually to "formulate policies, practices and procedures to carry out the funding of the Plan." Plan Document, § 6.09.

70. The SPD is particularly misleading in this area. It tells participants:

---

[2] The Advisory Committee is also referenced as the "Committee" or "Plan Committee" (SPD, § 9) thus causing further confusion in the Arrangement.

28

> The Plan Committee is a group of three persons who oversee benefits
> administration and determine day to day disputes which may arise under
> the Plan. One member is appointed by your Employer, another member is
> legal counsel to the Plan, and the third member is an independent party.

71.    In fact, no Advisory or Plan Committee for any Koresko sponsored plan has ever

met or ever done anything after execution of the Adoption Agreement. Koresko justifies this

through two stratagems.

72.    First, he includes the following language in the Plan Document:

> If an Administrator has been named in the Adoption Agreement, it
> shall assume and perform all and each and every, duty and
> responsibility to (sic) the Committee.
>
> * * *
>
> The term "Committee" as used herein shall include the
> "Administrator" unless the context of the instrument indicates a
> contrary intent.

73.    The pre-printed portion of the Adoption Agreement every employer must execute

names an Administrator, PennMont. Thus, the SPD intentionally misleads participants as to who

is in control of the Plan.

74.    Second, every Adoption Agreement designates Koresko as a member of the

Advisory/Plan Committee and is pre-stamped with his signature accepting the appointment. This

section further provides, in Koresko's standard small print, that: "This election by the Employer

is irrevocable and supersedes Article 6, Section 6.01 of the Plan." Section 6.01 of the Plan

purports to give the Employer the authority to appoint Advisory Committee members. Adoption

Agreement, § 9(b) states in its pre-printed portion that: "John J. Koresko, V is appointed as

secretary of the Committee and the Committee and the Trustee are authorized to act upon the

signature of the Secretary alone in matters pertaining to the Trust and the Plan."

75.     When an employer that is a member of the Advisory Committee attempts to be involved in any manner regarding payments of benefits to beneficiaries, or questions Koresko's authority, they are quickly admonished. In other words, all of the elaborate language about an Advisory/Plan Committee, how its members are appointed and its varied functions is a complete nullity.

**Other Illusory Separate Entities**

76.     The sleight of hand that makes the Advisory Committee disappear is part of the over-all illusion Koresko creates to entice the unwary into thinking there are a number of separate entities involved in the Arrangement, an illusion that implies legitimacy and the existence of checks and balances when none exist.

77.     The superficial structure Koresko created includes: (i) a League, (ii) a Trust, (iii) a Trustee, (iv) an Administrator, (v) Counsel, (vi) a "plan," (vii) a VEBA, and (vi) an Advisory/Plan Committee. In fact, this hall of mirrors reflects only one face, that of John Koresko.

**The Trust and the Trustee**

78.     According to the Adoption Agreement, the "Trust Name" to be inserted in §1.04(aa) of the Plan Document for the Erdman WBP is "The Regional Employers Assurance League, Region 4, Chapter A, Voluntary Employees' Beneficiary Association Trust;" the Trust Name for the Engineered WBP is ""The Regional Employers Assurance League, Region 3, Chapter C, Voluntary Employees' Beneficiary Association Trust." However, no documentation evidencing the actual creation of such a trust exists. The Trust Agreement is referred to as a "Master Trust Agreement" and Trust Agreement, § 4.1(a) envisions the Trust being divided into

30

separate Trust accounts, one for each REAL chapter, but there is no evidence indicating any sub-trusts were actually established.

79.     Regardless of whether separate chapter trusts ever existed, the Trust (or Trusts) was and is a phantom, for the supposedly independent trustee of the Trust entered into an agreement delegating control and operation of the Trust to Koresko's law firm. According to Koresko, these custodial powers delegated to him include: "the right not only to surrender, to rename, to sell, to do anything at all with those [insurance] policies." He claims the delegated powers also include:

> [A]uthority to sign and execute any and all necessary documents and forms to transact business involved in the insurance policies, the insurance policies or any policies that were delivered pursuant to the arrangements to effectuate the terms of the trust, including but not limited to surrender of, change of beneficiary of, application of payment premium to, change of ownership of, withdrawal of, cash value from and/or borrowing from any policy.

80.     In making this claim, Koresko relies on a custodial agreement between him and the bogus trustee. Adopting employers, employees and beneficiaries are not privy to this custodial agreement and are unaware of its existence until Koresko drags it out to justify his use or movement of funds.

81.     The powers the Trustee delegates to Koresko per the alleged custodial agreement are not powers the Trust Agreement gave to the Trustee in the first place and, thus, were not the Trustee's to delegate. Article V of the Trust Agreement enumerates the Trustee's powers and nothing therein even hints at the right to sell the policies, change policy beneficiaries, change policy ownership, withdraw cash value or borrow from life insurance policies. So, in another drafting sleight of hand, Koresko, qua trustee, delegates to himself, qua law firm and delegatee, powers the trustee never had.

31

82.     Not only, according to Koresko, has the trustee delegated its authority to him, it has ceded the right to any information concerning the trust it supposedly is trustee of.

83.     The authority to delegate Trustee functions to Koresko appears to be obscurely and dubiously sanctioned in the last sentence of § 2.05 of the Plan Document, which provides that: "Any reference in the Plan and Trust to "Trustee" shall also mean "Plan Administrator" when a duty, privilege or immunity has been delegated."

84.     According to the Plan Document, this delegated authority may well include "the right to involuntarily terminate the Employer's participation in this Plan . . . for any . . . action attributable to the Employer or its Employees which the Trustee, in its sole and absolute discretion, determines to be conduct detrimental to the League, this Plan, or the Trust, . . . ."

85.     In practice, Koresko deems any challenge to any of his decisions, including benefit determinations, as such detrimental conduct and, according to Koresko, as a basis to deprive a beneficiary of any benefits.

86.     Penn Public Trust, the trustee immediately preceding the appointment of the Independent Fiduciary (referenced above) does not even have phantom separation from Koresko. It is owned and controlled by him.

**The Administrator and Counsel**

87.     The Administrator, PennMont, is owned and controlled by Koresko and has no employees. Thus, whether a beneficiary is entitled to benefits is determined by Koresko. PennMont's "Counsel," the Koresko Law Firm and its staff, are one and the same as PennMont.

32

**The League**

88.     The Regional Employers' Assurance Leagues ("REAL") are completely ephemeral.

89.     Though the introduction to the Erdman WBP Adoption Agreement, states the "Employer is a member of the Regional Employers' Assurance Leagues (hereinafter "League"), Region 4, Chapter A," employers do not execute an application for League membership nor are they given any documents that purport to outline League rules or by-laws, let alone documents relating to the employer's region or chapter. The Engineered WBP is identical, but for the identified "Region" and "Chapter" (which are listed as "Region 3" and "Chapter C," respectively).

90.     Despite the complete lack of documentation concerning the League, the Plan Document states that:

> Termination of League Membership – An Employee who otherwise meets the requirements for eligibility and participation contained herein shall be a participant in this plan only during the period the Employer is a member of the League. Upon termination of the Employer's League membership, whether voluntary or involuntary, the Employee shall have no further right to the benefits hereunder, including without limitation, those benefits for which claims have been made but not yet paid on the date League membership terminates.

and,

> The League shall have the right to amend this Plan, in its sole discretion, from time to time and to amend or cancel any such amendments. Without limiting the scope of the foregoing, such amendments may include modification of the status of this plan for federal income tax purposes if future developments in the law indicate the utility of such change.

91.     As to the League's governance and where the crucial powers of involuntary termination and amendment actually rest, the only information is contained in the Trust

Agreement, which describes the League as a non-profit Pennsylvania corporation. However, a search of the Pennsylvania Department of State on-line records turns up no such corporation.

92.    According to the Trust Agreement, the Secretary or Assistant Secretary of the League is to certify to the Trustee the names of those authorized to act in various capacities. But no such corporate officers are otherwise identified and, since the corporation does not appear to have actually been created, records which might reveal the identities of the officers are non-existent.

93.    As REAL is the purported settlor of the Trust and REAL does not exist as an entity that can own property, the entire Trust is itself a fiction.

94.    As in the case of the Advisory Committee, the League's function as even a sham separate entity is done away with by another provision of the Koresko documents. Section 11.3 of the Trust Agreement provides that: "Unless otherwise specifically stated in the notice or direction, notice or direction from the Plan Administrator shall be deemed to be notice or direction from the League." In other words, PennMont speaks for the League unless it says it doesn't.

95.    One final nail in the coffin bearing any possible independent life for the League: The 2002 Trust Agreement's signature page indicates that Mr. Koresko signed on behalf of the League as Attorney in Fact.

**The VEBA**

96.    The VEBA is never defined in the documents. According to the PennMont website, the "REAL VEBA is a special trust which is set up to provide certain types of benefits for employees and owners of sponsoring companies." If so, it is just another name for the phantom Trust discussed above.

34

**The Plan**

97.     Within the bizarre world of the Koresko documentation, even the basic term "plan" is subject to confusion with alternate definitions at the ready as circumstances may require.

98.     The Erdman Inc. Adoption Agreement defines the Plan as the "Pamela K. Erdman, M.D., Inc. Health And Welfare Benefit Plan." The Engineered Adoption Agreement defines the Plan as the "Engineered Systems and Products, Inc., Health and Welfare Benefit Plan." Thus, per the Adoption Agreements, each adopting employer establishes its own plan. But even the Adoption Agreement creates some confusion. For example, the title of the Erdman Inc., Adoption Agreement bears a different name for the plan, calling it the "Voluntary Employees' Beneficiary Association Health and Welfare Benefit Plan for Employees of Pamela K. Erdman, M.D., Inc."

99.     The Plan Document incorporates the name set forth in the Adoption Agreement, § 2(a), *see* Plan Document, § 1.04(x), but, per § 1.01 of the Plan Document the name is actually the employer's "Health and Welfare Benefit Plan." And the title of the Plan Document christens the plan with yet a fourth name, "Regional Employers Assurance Leagues Voluntary Employees' Beneficiary Association Health and Welfare Benefit Plan for Employees of Pamela K. Erdman, M.D., Inc." The Engineered WBP Plan Documents follow the same pattern of confusion.

100.    The Trust Agreement throws more material confusion into the mix. It defines "Plan" as "the REAL VEBA established by each Chapter of REAL pursuant to this Trust Agreement and adopted by each Adopting Employer." This definition not only appears to conflate any distinction between the Trust and the Plan (see above where PennMont website

35

describes the REAL VEBA as a trust), it raises ambiguity as to whether there are separate plans for each employer or only one plan.

101.    Finally, buried near the very end of the Plan Document is a provision that purports to make all the indications that the employer has created its own separate plan meaningless. The last two sentences of § 10.19 of the Plan Document states:

> The execution of an Adoption Agreement by a Participating Employer shall not give rise to the creation of a new Plan, but shall be construed as merely the adoption of a separate benefit structure under the League's Plan consistent with Regulations Section 1.414(l) – 1(b)(1). This Employer's plan is an integral part of the League's plan so long as the Employer is a member of the League.

102.    In other words, though the Plan Document states that it "evidences the Plan portion of a Voluntary Employee's Beneficiary Association Plan and Trust established by the Employer for the benefit of its eligible Employees", another section states the employer established a plan that is not a plan.

103.    If it is even possible to further confuse the matter, up until 2002 employer contributions were made for the benefit of individual, employer specific, welfare benefit plans.

104.    Thus, according to these strange documents, the League is an unincorporated corporation, i.e. a nullity, the Plan may or may not be the employer's own VEBA, separate trusts for each alleged chapter of the non-existent League may or may not exist, Advisory Committee means Plan Administrator, the independent trustee is not independent, Trustee may well mean Plan Administrator, Plan Administrator means PennMont and PennMont means the employees of Koresko's law firm.

36

**The Release Requirement**

     105.    The documents contain what amounts to a prospective release of Koresko and his

various entities. Section 10.11 of the Plan Document provides:

> Receipt and Release for Payment. Any payment to a Participating
> Employee, his legal Representative, beneficiary or other permitted
> party, shall to the extent thereof, be in full satisfaction of claims
> hereunder against the Plan, the Trustee, Plan Administrator, and
> Employer, any of whom may require such Participating Employee,
> his legal Representative, beneficiary or other payee to execute a
> receipt and release in such form as shall be required by the Trustee
> or Plan Administrator, in its sole discretion. In the event of
> termination of participation in the Plan, the trustee or Plan
> Administrator may require such a receipt and release from the
> Employer.

As this gives Koresko the power to insist upon a release before paying even undisputed

benefits, it, in effect, forces the beneficiary to make a true Hobson's choice.

**The Irrevocable Powers of Attorney**

     106.    Koresko's documents contain clauses that purport to bestow upon him irrevocable

powers of attorney. These include:

- Adoption Agreement, § 9(b) – Irrevocable designation of Koresko as secretary of the Plan/Advisory Committee.

- Plan Document, § 10.21 – "Employer hereby appoints the Administrator, Trustee, or their delegate its attorney in fact with respect to all questions, controversies, and issues relating to the Plan before the Internal Revenue Service and Department of Labor. This power of attorney is irrevocable."

- Participation Agreement – Provides "Limited Power of Attorney" from employer to PennMont and Koresko "with respect to all matters connected with and/or related to the procurement and maintenance of benefits payable to Employee pursuant to REAL VEBA and the Employer's Welfare Benefit Plan."

     107.    Koresko interprets these powers of attorney as granting him the right to take

whatever actions he pleases regarding the life insurance policy proceeds upon the participant's

death. He also interprets the power of attorney as giving him immunity.

37

108.    When convenient, Koresko uses this purported power of attorney to insist that he

speaks for and actually represents the interests of the beneficiaries he is defrauding.

109.    Koresko also interprets the power of attorney as allowing him to make payment

out of trust assets for whatever "fees" or "trust related services" he deems appropriate, including

whatever legal fees he chooses to have paid to the Koresko Law Firm and administrative fees he

chooses to have paid to PennMont.

**Plan References to ERISA**

110.    The plan contains several references to the Employee Retirement Income Security

Act ("ERISA") and the SPD informs participants that "The Plan is covered by the Employee

Retirement Income Security Act of 1974 ("ERISA") which was designed to protect employees'

rights under benefit plans." Further, the Plan Document contains numerous references to

ERISA, indicating that terms within the Plan shall have the meaning as given by ERISA and that

the plan "shall be construed as intending compliance with same." Also, the Plan specifically

references the ERISA provision regarding pre-emption of state law claims where it discusses

"Applicable Law."

111.    Koresko, however, flip-flops regarding the applicability of ERISA to the plan at

his convenience. Thus, references within the documents to ERISA further mislead employers and

participants regarding the protection of federal law, which Koresko deems meaningless

depending on his self-interest.

**The Plan As Interpreted By Koresko**

112.    A related case brought by the Department of Labor, *Solis v. Koresko*, No. 09-0988

(E.D. Pa.) provides insight into Koresko's interpretation of the documents. This includes his

view that he can use plan assets designated as surplus to pay his attorneys' fees and that such attorneys' fees are a legitimate expenditure under plan terms.

113.    The Arrangement, as Koresko interprets it, differs from the impression created by the marketing and by the convoluted documentation.  In essence, Koresko interprets the Arrangement as nothing more than his unsecured promise to possibly pay a death benefit upon terms and conditions he can determine and revise at his sole discretion. He is the sole arbiter of entitlement to benefits, has the authority to amend the Plan at any time to change benefits and eligibility requirements, and can use Plan and Trust assets for any purpose he deems appropriate.

**Koresko's Unfettered Use Of Plan "Surplus"**

114.    In terms of the long-term scheme, probably the most significant fact is that Koresko reads his documents as granting him the sole discretion to declare Trust and Plan assets as "surplus." Such a declaration, according to Koresko, frees him from any fiduciary responsibilities or constraints on how these supposedly surplus assets are used.

115.    The primary source of this "surplus" is the life insurance proceeds denied plan participants, either through a determination of ineligibility or through coercing acceptance of the present value of a 10-year payout of the proceeds.

116.    Koresko utilizes a number of pretexts to allocate insurance proceeds as surplus. For example, Koresko claims the documents contain a "bad boy clause" and he interprets that clause as permitting him to deny benefits – and turn the insurance proceeds into surplus – for technical and/or encouraged errors, such as an incorrect census form.

117.    The "bad boy" clause states:

> General Limitation on Benefit Payment: Notwithstanding any provision of this Plan and Trust, a Participant who has less than ten years of participation shall forfeit any benefit payable hereunder if it is determined by the Plan Administrator that he has engaged in a

39

disqualifying act with respect to the Employer, Employees, or to the League. A Participant shall be deemed to have engaged in a disqualifying act if he is determined by the Plan Administrator to have: (1) been guilty of committing theft, fraud or embezzlement with respect to the Employer; or (2) committed any criminal act or malicious act [not rising to the level of a crime] which damages the person or property of the Employer, Employees or the League. The judgment of the Plan Administrator as to whether a Participant has committed a disqualifying act shall be final, unless made without evidence to support such judgment.

118.    Koresko interprets this clause as giving him discretion to assert a violation of the "bad boy" clause and disqualify a participant from their entitlement to a benefit. He uses this discretion to deprive beneficiaries of life insurance proceeds for trivial reasons, such as census errors.

119.    Koresko also uses the "bad boy" clause as a means to intimidate employers who challenge an offer of reduced death benefits to one their employees. If an employer or beneficiary challenges a benefit determination, the Koresko Parties accuse them of violating the clause and risking forfeiture of benefits.

120.    Koresko also interprets the documents as permitting him to treat as "surplus," i.e. isolate from the potential claims of any beneficiary or participant, amounts realized when insurance companies who have issued policies on the participants' lives demutualize.

121.    Koresko further interprets his agreements as permitting him to sue any participant who disagrees with him and to use that participant's VEBA funds to finance the litigation.

122.    Perhaps one of the most outrageous ways Koresko deprives beneficiaries of the insurance proceeds and funnels those proceeds into "surplus" is by telling the heirs of owners who experienced bad economic years preceding their deaths that they are entitled to nothing for that reason.  When joining the Arrangement, owner/employees are led to believe the exact opposite will occur if times are bad.

40

123.    Koresko also coerces the beneficiaries of the insurance policies to accept roughly 20% less than the face value of the policies, the difference effectively going into his pockets as "surplus."

124.    Koresko views his documents as permitting him to eviscerate the value of the death benefit he promises in other ways. He claims that since his documents don't say when benefit payments are supposed to start, the inception date is for him to decide. He also claims that he can pay benefits in such a manner as to effectively pay nothing for ten years. Any financial gain to the Trust resulting from these various ways of denying or limiting benefits Koresko considers "experience gains" that are "surplus" for the benefit of Mr. Koresko.

125.    Documents produced in *Solis v. Koresko* show that from 2002 to 2008 employers paid approximately $158 Million in contributions of which approximately $104 Million was used for premium dollars that went through the Koresko controlled trust account and was used to purchase life insurance policies.

126.    Conservatively, this amount of premium dollars purchased at least $500 Million in insurance coverage on the lives of plan participants.

127.    The vast majority of the participants are still alive and, therefore, their beneficiaries have yet to realize that, upon the participants' death, the insurance proceeds will either be skimmed or completely converted for Koresko's personal benefit.

128.    Even if the policy proceeds are only skimmed based on Koresko's "present value" scam, approximately $100 Million will be converted from the rightful beneficiaries to Koresko.

41

**THE PLAINTIFFS' INVOLVEMENT WITH THE KORESKO ARRANGEMENT**

**Erdman Inc.'s Involvement**

129.    During the year 2000, Dr. Erdman became interested in obtaining insurance coverage for herself and her employees at Erdman Inc.  While searching for the means to accomplish this goal, Dr. Erdman read an article published by Defendant Lee Phillips describing the benefits of a VEBA.

130.    After reading this article, Dr. Erdman and her husband, Don Erdman, attended a financial planning seminar Phillips conducted in Atlanta, Georgia.  There, Phillips distributed documents trumpeting the many supposed benefits of entering a VEBA.

131.    Upon information and belief, Phillips served as American General and the Koresko Parties' agent, inducing individuals such as plaintiffs to purchase American General life insurance policies and enter into the Koresko Arrangement.

132.    After reviewing his materials, Dr. and Mr. Erdman met with Phillips in Atlanta, where Phillips, acting on behalf of the Koresko Parties, prepared and presented them with the Koresko Arrangement documents.

133.    During their meeting, Phillips advised Erdman of the promised benefits of the Arrangement – namely, that it would allow them to:

        a.    Deduct the insurance premiums as business expenses;

        b.    Purchase permanent life insurance for Dr. Erdman and term life insurance for the employees at Erdman, Inc.;

        c.    Accumulate cash value in Dr. Erdman's policy through investment returns, for Dr. Erdman's personal benefit on a tax-deferred basis;

     d.     Provide a death benefit to Dr. Erdman's designated beneficiaries equal to the face amount of her policy;

     e.     Allow the Erdmans to use accumulated cash value to pay for various expenses, including medical expenses; and, perhaps most importantly for the Erdmans,

     f.     Allow Dr. Erdman and Erdman Inc. to exit the plan at any time and receive her policy's full, accumulated cash value.

134.     The Erdmans delivered this information to a tax professional, Richard White, who concurred with Phillips's representations based on his review of the Arrangement documents.

135.     In reliance on the truth of these various representations and on the various promotional materials given to them by the Koresko Parties and Phillips, Dr. Erdman and Erdman Inc., decided to purchase cash value life insurance on Dr. Erdman's own life and term insurance on the lives of Erdman Inc.'s other employees through the Koresko 419A(f)(6) arrangement.

136.     In order to purchase the insurance policies, Phillips explained that Erdman Inc., had to execute the Adoption Agreement. The Erdmans were also provided with the Master Plan Agreement and the Trust Agreement.

137.     Phillips also informed the Erdmans that the complicated format of the documentation was needed to satisfy IRS requirements and that they need not pay attention to the details.

138.     In reliance on the truth of these various representations and on the various promotional materials given to them by the Koresko Parties through Phillips, Erdman Inc., executed the documents Phillips prepared to enter the Arrangement. Dr. Erdman then purchased life insurance on her own life through the Koresko Arrangement.

139.    Phillips advised the Erdmans that the cash value policies should be purchased from American General through an insurance agency in Utah, operated by Defendant Clark Gardner. Upon information and belief, Phillips acted as Gardner's outside salesperson and the two individuals worked together selling and administering life insurance policies for the REAL VEBA Arrangement.

140.    Upon information and belief, Phillips and Gardner were/are also both associated with Defendant Sammons. Sammons acted / currently acts as the "broker-dealer" listed on Dr. Erdman's insurance policy.

141.    Upon information and belief, American General had actual and/or constructive knowledge of all the material aspects of the REAL VEBA Arrangement. More specifically:

   a.    American General had actual and/or constructive knowledge that the REAL VEBA Arrangement was designed as a pass-through to allow the owners of closely held companies to purchase cash value/permanent life insurance and claim the premiums as business expenses;

   b.    American General had actual and/or constructive knowledge that the REAL VEBA Arrangement was designed to allow the owners to access the accumulated cash value in the life insurance policies by terminating their participation and that the owners were the true equitable and beneficial owners of the policies;

   c.    American General had actual and/or constructive knowledge that, despite the Koresko Parties assertion that "all assets were available to satisfy all claims," in fact the Arrangement had been structured so that participants and beneficiaries could not make a recovery if the insurance policies purchased on their behalf were not available to

44

fund payment even though all participants were led to believe that the policies were theirs and that the trust functioned as a straw party;

        d.      American General had actual and/or constructive knowledge that the claimed tax benefits of the REAL VEBA were highly questionable and unlikely to survive IRS scrutiny;

        e.      American General had actual and/or constructive knowledge that in the absence of the business owner's ability to access the cash value of the policies it made absolutely no sense for the business owner to pay the substantially higher premiums associated with the cash value policies being purchased through the REAL VEBA Arrangement; and

        f.      American General had actual and/or constructive knowledge that the REAL VEBA Arrangement required the business owners to contribute amounts equivalent to the premiums being charged for the cash value policies and that the business owners were the actual payors of the premiums American General received.

142.     Upon information and belief, despite this knowledge, American General permitted and encouraged its agents to sell American General policies via the REAL VEBA Arrangement and encouraged the Koresko Parties and Phillips to promote American General as the insurance company of choice when marketing the REAL VEBA Arrangement.

143.     American General paid the Koresko Parties and Phillips substantial commissions in exchange for promoting and selling American General policies through the Arrangement and on one occasion even honored John Koresko as "agent of the year."

144.     To purchase the policy through the arrangement, Erdman Inc. was required to and did sign the Adoption Agreement and the following American General cash value life insurance

45

policy was applied for and purchased through the arrangement: American General Policy No. VL1005356V – Total Death Benefit: $1,500,000

145.    To purchase the policies, Edman Inc., paid over $100,000 to one or more of the Koresko Parties for the benefit of the Erdman WBP. Erdman Inc., contributed over $400,000 in total policy premiums between 2001 and 2004.

146.    These sums were then transferred to American General, which paid the Koresko Parties substantial commissions in exchange. The policies were, on their face, owned by a trustee "f/b/o the Erdman Welfare Benefit Plan" and the beneficiary was also a trustee f/b/o the Erdman WBP.

**Engineered's Involvement**

147.    Before entering the Koresko Arrangement, the Fradlins previously purchased life insurance. However, in 2001, Mr. Fradlin's former insurance agent introduced him to an agent peddling the Koreskos' REAL VEBA Arrangement – Theodore Provenza of "The Provenza Group" (collectively, "Provenza"). Provenza offered to sell Mr. Fradlin what Provenza promised to be more beneficial life insurance through the Koresko Arrangement.

148.    Upon information and belief, Provenza served as American General and the Koresko Parties' agent, inducing individuals such as the Fradlins to purchase American General life insurance policies and enter into the Koresko Arrangement.

149.    Provenza, like Phillips,[3] touted the many benefits of entering the Arrangement. Specifically, Provenza represented the Arrangement as a way to purchase life insurance for both Mr. and Mrs. Fradlin by treating the policy premiums as Engineered's business expenses.

---

[3] As described below. Lee Phillips and Clark Gardner later became involved with the Fradlins as well.

46

Provenza also explained that Engineered could use the Arrangement to provide life insurance for Engineered's other employees.

150.    Provenza assured the Fradlins that the Arrangement was "100% legal" and that if either Mr. or Mrs. Fradlin were to die, the surviving spouse would receive the face value of their life insurance policies as a contingent beneficiary.

151.    Provenza explained the Arrangement's benefits in a meeting with the Fradlins, accompanied by several Provenza associates. In addition, Jeanne Bonney, one of Koresko Parties' agents and attorneys, joined the meeting via teleconference to assure the Fradlins of the Arrangement's legitimacy. Upon information and belief, either John or Lawrence Koresko was also present on the teleconference line.

152.    During their meeting, Provenza provided the Fradlins with the Arrangement documents, as well as many of the promotional materials described above.

153.    In reliance on the truth of these various representations and on the various promotional materials given to them by the Koresko Parties through Provenza, Mr. and Mrs. Fradlin decided to purchase cash value life insurance on their lives through the Koresko 419A(f)(6) Arrangement.

154.    In order to purchase the insurance policies, Provenza explained that Engineered had to execute the Adoption Agreement. The Fradlins were also provided with the Master Plan Agreement and the Trust Agreement.

155.    Provenza and Bonney also informed the Fradlins that the complicated format of the documentation was needed to satisfy IRS requirements and that they need not pay attention to the details.

156.     In reliance on the truth of these various representations and on the various

promotional materials given to them by the Koresko Parties through Provenza, Engineered

executed the documents and entered the Arrangement. Mr. and Mrs. Fradlin then purchased life

insurance on their lives through the Koresko Arrangement.

157.     Provenza advised the Fradlins that the cash value policies should be purchased

from American General and that Lawrence Koresko would act as their insurance agent. Upon

information and belief, Provenza acted as the Koresko Parties' outside salesperson and Provenza

worked with the Koresko Parties selling and administering life insurance policies for the REAL

VEBA Arrangement.

158.     Upon information and belief, American General had actual and/or constructive

knowledge of all the material aspects of the REAL VEBA Arrangement, as described in

paragraph 141, above.

159.     Upon information and belief, despite this knowledge, American General

permitted and encouraged its agents to sell American General policies via the REAL VEBA

Arrangement and encouraged the Koresko Parties and Provenza to promote American General as

the insurance company of choice when marketing the REAL VEBA Arrangement.

160.     To purchase the policies through the Arrangement, Engineered was required to

and did sign the Adoption Agreement and the following American General cash value life

insurance policies were applied for and purchased through the arrangement:

    a.  American General Policy No. A10196609L – Total Death Benefit: $2,500,000

    b.  American General Policy No. A10196608L – Total Death Benefit: $2,500,000

161.    To purchase the policies, Engineered paid $250,000 to one or more of the Koresko Parties for the benefit of the Engineered WBP.  Engineered later contributed an additional $250,000 for benefit of the Engineered WBP.

162.    These sums were then transferred to American General, which paid the Koresko Parties and Provenza substantial commissions in exchange.  The policies were, on their face, owned by a trustee "f/b/o the Engineered Welfare Benefit Plan" and the beneficiary was also a trustee "f/b/o the Engineered WBP."

163.    After purchasing the life insurance policies, Provenza and the Koresko Parties advised the Fradlins that they could cancel their previous life insurance policies because they would no longer be necessary in light of the superior policies the Fradlins purchased through the Arrangement.  In reliance on this advice, the Fradlins cancelled their pre-existing life insurance policies, leaving them with only the American General life insurance policies.

## PLAINTIFFS' ATTEMPTS TO WITHDRAW FROM THE ARRANGEMENT

### Erdman Inc.'s Attempt to Withdraw from the Arrangement

164.    Initially, the Erdmans received quarterly statements from American General (through Lee Phillips) reflecting the accumulated cash value in Dr. Erdman's policy.  In 2007, the Erdmans noticed a policy loan of $50,315.83 was taken out against their accumulated cash value of $507,265.27.

165.    Obviously concerned, the Erdmans asked Lee Phillips what these loans meant. Phillips repeatedly assured the Erdmans that the documents simply reflected "accounting information," that they owed no money, and that they need not pay any attention to the statements.  Phillips explained that their money was being pooled with other REAL VEBA participants, and that the "loans" they saw were likely misconstrued based on a "bookkeeping

49

methodology." He promised that the loans were nothing more than "a computer generated number with no significance" to the Erdmans.

166.    Not quite satisfied with their response, the Erdmans then contacted Larry Townsend, an employee and agent of the Koresko Parties at PennMont, to inquire whether Phillips's explanation was accurate.  Townsend confirmed that the Erdmans did not "owe any money" on the policy loans, and curiously he informed them that they were not supposed to be receiving the statements at all.

167.    Around this same time, the Erdmans began receiving inquiries from the IRS regarding whether their participation in the REAL VEBA was permissible under the tax Code. Facing IRS inquiry, in 2007, Plaintiffs attempted to terminate their participation in the Koresko Arrangement.

168.    Dr. Erdman received a letter from Jeanne Bonney of PennMont (with copies sent to Clark Gardner), providing a detailed list of all documents necessary to exit the Arrangement. Dr. Erdman, through Erdman Inc., completed all necessary documentation and submitted everything to Penn-Mont.

169.    But Penn-Mont refused to terminate Erdman Inc.'s participation in the Arrangement.

170.    While refusing their request to terminate participation, the Koresko Parties reassured Dr. Erdman and Mr. Erdman that they would eventually be able to terminate once the Koresko Parties' IRS issues were resolved; that the Erdmans owed no money on what was listed as policy loans on the quarterly statements; that Dr. Erdman's cash value was safe; and that in the event of death, the policy's face value would be paid out to Dr. Erdman's beneficiaries.

50

171.     During this time, a second policy loan was taken out in 2008, totaling an
outstanding balance of $105,322.84 as of 9/30/2008. A third loan was later taken out in 2009,
totaling $538,075.04 of outstanding policy loans as of 12/31/2009.

172.     Erdman Inc. later tried to terminate its participation in November 2009 and
August 2011. The Koresko Parties refused both requests. In 2011, Larry Townsend cited
PennMont's legal troubles as the basis for the Koresko Parties' refusal. This time, Townsend
also threatened that if the Plaintiffs stopped allowing PennMont to pay its administrative fees
through returns on the Plaintiffs' cash value, PennMont would stop defending Plaintiffs before
the IRS.

173.     At bottom, Townsend stated definitively that the decision to allow plaintiffs to
exit the Arrangement was at the "administrator's discretion," and it was in the "best interest" of
every participant if no participant left the Arrangement.

174.     The Erdmans' hope for a return on their investment began to diminish during the
summer of 2013. They learned that the DOL had commenced a lawsuit against Koresko, the
Koresko Entities and others, asserting various breaches of fiduciary duty in connection with the
operation of Koresko's 419A(f)(6) Arrangement.

175.     The Erdmans also learned through investigation into the facts surrounding the
DOL lawsuit and other related litigation, that:

        a.     The Koresko Parties had deceived them and that the Koresko Parties had
        no intention of honoring the representations that induced them to enter into the
        Arrangement;

        b.     The Koresko Parties had been using the accumulated cash value in many
        REAL VEBA participants' insurance policies for John Koresko's personal benefit. Upon

51

this realization, the District Judge, the Honorable Mary McLaughlin, eventually removed the Koresko Parties from any position of trust relating to the REAL VEBA and the SEWBP Trusts, attempting to avoid any further theft of Trust assets. An Independent Fiduciary (IF) was appointed to take their place.

c.     Contrary to the Koresko Parties' representations and contrary to the impression created by the Plan documents: (i) the Koresko Parties interpreted the Arrangement as permitting them to deny or substantially lessen the death benefit beneficiaries would receive; (ii) that the Koresko Parties interpreted the Arrangement as permitting them to borrow against the cash value of the life insurance policies Erdman Inc., purchased; (iii) that the Koresko Parties would not permit the plaintiffs to withdraw the insurance policies or the cash value accumulated within the policies if Erdman Inc., elected to terminate its participation; and (iv) that the Koresko Parties asserted they had the right to unilaterally alter the identity of beneficiaries, the amount of the benefit, and any other aspect of the Arrangement at their absolute discretion.

176.    The Erdmans learned this in 2013 when, after receiving little communication from the Koresko Parties – and virtually no information specific to Plaintiffs – the Erdmans contacted Clark Gardner to inquire about the status of their death benefits. Plaintiffs reached out to Gardner on this issue because they had learned that other REAL VEBA and SEWBPT participants had been denied their death benefit claims. Hoping they would not face the same fate, Plaintiffs called Lee Phillips who referred them to Clark Gardner. Gardner explained their death benefit was **not** their policy face value but instead would be a multiple of their income. Dr. Erdman explained that she was retired and had no income, meaning she would receive no death benefit.

52

177.    Clark Gardner continued to assure Plaintiffs that Koresko was "honest" and acting in the "best interests of his customers."

**Engineered's Attempt to Withdraw from the Arrangement**

178.    Much like Dr. Erdman, the Fradlins also faced IRS inquiry.   Roughly seven years after entering the Arrangement, the IRS contacted the Fradlins seeking to assess penalties and back-taxes for the large sums Engineered had contributed to the Arrangement for the benefit of the Fradlins.  The State of Maryland later contacted the Fradlins, also seeking money relating to the Engineered WBP.

179.    The Fradlins were responsible for approximately $300,000 in taxes and penalties due to their reliance on Provenza's and the Koresko Parties' representations regarding the Arrangement's legality.

180.    After incurring these enormous charges, the Fradlins wanted to know more about their policies and the Arrangement.  They contacted the Koresko Parties to ask how much cash value their policies had accrued.  Unable to receive a response, the Fradlins then turned to Provenza for answers.  Upon information and belief, Provenza contacted American General and learned that at least $180,000 had been removed from the Fradlins' insurance policies through unauthorized action of the Koresko Parties.

181.    After learning about the loans, Mr. Fradlin contacted the Koresko Parties via email but received no response.

182.    The Fradlins demanded answers.  Provenza then introduced Mr. Fradlin to Clark Gardner and Lee Phillips – both of whom assured the Fradlins that the Koresko Parties were only acting in the Engineered WBP's best interests, and that the Fradlins had no reason to question their confidence in the Koresko Parties.  Gardner even helped Mr. Fradlin draft a letter to John

53

Koresko, asking for updates about the status of the Engineered WBP and the Fradlins' insurance policies.

183. The Fradlins sent their letter in or around March 2011. Again, they received no response.

184. After his unsuccessful attempt to learn more about the Engineered WBP and the Fradlins' policies, Mr. Fradlin began regularly contacting Lawrence Koresko and Larry Townsend at PennMont. Fradlin spent over a year demanding answers for the Koresko Parties' actions, and that the Koresko Parties return his money. Finally, Fradlin received a call from PennMont promising that the money would be returned.

185. Fradlin requested documentation proving that the Koresko Parties had indeed paid back the loans taken against the Engineered WBP's policies. Perhaps unsurprisingly, the Koresko Parties balked at the request.

186. The Fradlins were left with no confidence in the Koresko Parties or the Arrangement. Mr. Fradlin repeatedly asked what might happen to his and Mrs. Fradlin's insurance policies if he ever decided to sell his business, but again received no clear answer. Thus, Fradlin demanded to withdraw Engineered from the Arrangement.

187. The Koresko Parties thwarted Fradlin's efforts to exit the Arrangement, explaining that the decision whether to grant a termination request was within the discretion of the Koresko Parties.

**The Koresko Parties Strip Out the Case Value**

188. Though aware of the DOL lawsuit, the Erdmans were not aware until later in 2013 that the Koresko Parties had been converting the cash value that had been accumulating in the insurance policies nominally owned by the REAL VEBA and the SEWBPT.

54

189.    Unbeknownst to and hidden from all plaintiffs:

a.    Upon information and belief, between August and November 2009, the Koresko Parties withdrew more than $35 million in loans from insurance policies owned by the Trust for the benefit of plaintiffs and other Arrangement participants.

b.    In 2009, the Koresko Parties unilaterally amended the terms of the documents purportedly governing the plan so as to prevent plan participants from obtaining information concerning the insurance policies that the Koresko Parties held as straw parties for the plan participants.

c.    Plan participants were not provided with copies of the amendments and were only provided with limited, misleading and false information about the nature and reason for the amendments.

d.    The Koresko Parties then utilized the illegitimate changes in policy ownership, the invalid amendments and other concocted documents to remove the maximum amount of cash value from the policies via loans.

190.    Though aware of the initial conversions, the Fradlins had been led to believe that their money had been returned. Though the Koresko Parties told Fradlin this over the phone, Fradlin never received documents displaying the cash value and loan status for his American General policy. At some time within the previous two years, Fradlin was able to speak with a representative at American General regarding the Engineered WBP policies. He learned that his and Mrs. Fradlin's policies remained encumbered with the Koresko Parties' loans.

191.    Dr. Erdman, on the other hand, did not receive documentary confirmation that the Koreskos had indeed encumbered her policies with sizeable loans until 2014. This confirmation came by way of a letter, dated May 12, 2014, from the Independent Fiduciary ("IF") appointed

by this Court in a related case, *Solis v. Koresko et al.*, 2:09-cv-00988-MAM. The letter explained that the loans were indeed taken out against plaintiffs' policies through action of the Koresko Parties, despite the repeated assurances plaintiffs received to the contrary since as early as 2007. The IF also sent a similar letter to the Fradlins, displaying the remaining loans taken against the Fradlins' policies.

192.    American General permitted the cash value in the policies on the lives of Dr. Erdman and the Fradlins to be removed without obtaining plaintiffs' permission and without even notifying plaintiffs despite:

      a.    American General's actual and constructive knowledge that the funds were being held for the plaintiffs' benefit and that the loans served no purpose that could possibly benefit the plaintiffs; and

      b.    Being provided with facially questionable documentation that put American General on notice that the plaintiffs were unaware of what was being done and that the loans were illegitimate.

193.    After permitting the loans, the defendants refused to provide plaintiffs with any information concerning the status of the insurance policies.

194.    At least $560,000 in cash value was improperly removed from the Erdman WBP. At least $18,000 in cash value is still missing from the Engineered WBP.

195.    As of the date of filing this complaint, to the best of plaintiffs' knowledge the cash value loans have not been repaid.  (See IF letter, Attached as Ex. E).

196.    In sum, plaintiffs were left with nothing but assurances: the REAL VEBA Trust "owned" plaintiffs' insurance policies; the Koresko Parties held and controlled plaintiffs' accumulated cash value; and plaintiffs could do nothing about it.  However, the Koresko Parties

continued to reassure plaintiffs that, once the Koresko Parties resolved their issues with the DOL and IRS, plaintiffs would be able to exit the Arrangement, reclaim their policies (or the cash value the policies accrued), and go about their business.

**COUNT I – ERISA, 29 U.S.C., § 1132(a)(3)**
**Dr. Erdman and Mr. & Mrs. Fradlin v. All Defendants**

197.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 196 above as though set forth at length herein.

198.    The Erdman WBP and Engineered WBP (collectively, "Plaintiffs' WBPs") are Employer Welfare Benefit Plans within the meaning of ERISA, 29 U.S.C. § 1002(1).

199.    Dr. Erdman and Mr. Fradlin are participants in and fiduciaries of the Plaintiffs' WBPs.

200.    John J. Koresko, V, Lawrence Koresko and American General (the "Fiduciary Defendants") are fiduciaries of the Plaintiffs' WBPs within the meaning of ERISA, 29 U.S.C., § 1002(21).

201.    The Fiduciary Defendants breached their fiduciary duties by misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits, structure, and ownership of plan assets; converting or permitting conversion of plan assets; and performing their duties in their own self-interest and to the detriment of participants and future beneficiaries. The conversions and self-dealing were also prohibited transactions violative of §§ 406(a) and 406(b) of the Act.

202.    The defendants, whether deemed fiduciaries or not:

    a.    Knowingly participated in actions violative of ERISA and violative of the terms of the Plaintiffs' WBPs; and

57

    b. Knowingly participated in prohibited transactions violative of §§ 406(a) and

       406(b) of the Act

**WHEREFORE**, Plaintiffs request that:

    1. The defendants be ordered to:

        a. Make full restitution of all funds converted from the cash value of the

          insurance policies on the lives of the Plaintiffs' WBPs participants;

        b. Disgorge or make restitution of all fees, commissions or any other form of

          compensation paid or profits made in violation of § 406 of the Act; and

        c. Make full restitution of all profits that the Plaintiffs' WBPs would have

          earned on the converted funds;

    2. Plaintiffs be awarded attorneys fees and cost; and

    3. The Court award such other equitable relief as it deems appropriate.

### COUNT II – ERISA, 29 U.S.C. § 1132(a)(2)
### All Plaintiffs v. The Fiduciary Defendants

203.   Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 202 above as though set forth at length herein.

204.   The Fiduciary Defendants breached their fiduciary duties by converting or permitting conversion of plan assets and performing their duties in their own self-interest and to the detriment of the Plaintiffs' WBPs.

    **WHEREFORE**, plaintiffs request that:

    1. The Fiduciary Defendants be ordered to:

        a. Make full restitution of all funds converted from the cash value of the

          insurance policies on the lives of the Plaintiffs' WBPs participants;

    b.  Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of § 406 of the Act; and

    c.  Make full restitution of all profits that the Plaintiffs' WBPs would have earned on the converted funds;

2.  Plaintiffs be awarded attorneys fees and cost; and

3.  The Court award such other relief as it deems appropriate.

## COUNT III – COMMON LAW FRAUD FOR CONDUCT PRIOR TO THE ESTABLISHMENT OF THE PLAINTIFFS' WBPs

### All Plaintiffs v. All Defendants

205.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 204 above as though set forth at length herein.

206.    Prior to the establishment of the Plaintiffs' WBPs, defendants, including American General through its agents John and Lawrence Koresko, Lee Phillips, Clark Gardner, Ted Provenza, and Sammons, made the numerous intentionally false representations described above in order to induce plaintiffs to purchase cash value life insurance policies through the REAL VEBA Arrangement.

207.    The misrepresentations and omissions were known or should have been known to the defendants to be false when made, were material in nature, and were made with the intent to deceive, defraud and/or induce plaintiffs, and in fact, induced plaintiffs to purchase the American General policies through the REAL VEBA Arrangement.

208.    Alternatively, the misrepresentations were made in negligent and reckless disregard as to their truth or falsity.

209.   In reasonable reliance on the fraudulent representations, plaintiffs were induced to purchase the American General policies through the REAL VEBA Arrangement, to their substantial harm and financial injury.

**WHEREFORE**, plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined.

### COUNT IV– RICO
**All Plaintiffs v. Defendants John Koresko, Lawrence Koresko, and American General**

210.   Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 209 above as though set forth at length herein.

211.   The Koresko Entities (The Penn Public Trust, PennMont, the Koresko Law Firm, Koresko Financial LP, Penn-Mont Benefits, Inc., Penn-Mont Benefits Services, Inc., and John Doe Companies 1-50) are, singly and collectively, enterprises within the meaning of 18 U.S.C. § 1961 *et seq.*, and are engaged in interstate commerce.

212.   Defendants John Koresko, Lawrence Koresko, and American General are persons within the meaning of 18 U.S.C. § 1962 who have conspired and conducted the affairs of the enterprises through a pattern of racketeering activity including but not limited to numerous acts of mail fraud, wire fraud and conversion of assets of employee welfare benefit plans, in violation of 18 U.S.C. §§ 664, 1341 and 1343.

213.   Defendant American General is liable for John Koresko and Lawrence Koresko's, actions under principles of *respondeat superior*.

214.   As a consequence, defendants John Koresko, Lawrence Koresko, and American General are in violation of 18 U.S.C. § 1962(c) and (d).

215.   Plaintiffs have been injured in their property by reason of these violations.

60

**WHEREFORE**, plaintiffs request judgment against defendants John Koresko, Lawrence Koresko, and American General including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.

### COUNT V– COMMON LAW FRAUD FOR CONDUCT AFTER THE ESTABLISHMENT OF THE PLAINTIFFS' WBPs
### All Plaintiffs v. All Defendants

216.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 215 above as though set forth at length herein.

217.    Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, under common law principles for the fraud and misrepresentations described above.

218.    The misrepresentations and omissions were known or should have been known to the defendants to be false when made, were material in nature, and were made with the intent to deceive, defraud and/or induce plaintiffs, and in fact, induced plaintiffs to purchase the Plan.

219.    Plaintiffs reasonably relied on the defendants' misrepresentations.

220.    As a consequence of such reliance, plaintiffs have suffered and will in the future suffer both monetary damages and other harm for which there is no adequate remedy at law.

221.    Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, plaintiffs request judgment in their favor and against defendants for compensatory damages in an amount to be determined but in excess of $75,000.00 and exemplary damages.  Plaintiffs also request such equitable relief as the Court shall consider appropriate.

## COUNT VI – COMMON LAW BREACH OF FIDUCIARY DUTY
### All Plaintiffs v. The Fiduciary Defendants

222.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 221 above as though set forth at length herein.

223.    Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, for common law breach of fiduciary duty.

224.    The Fiduciary Defendants stand in a fiduciary relationship to Erdman Inc., Engineered, and the Participant Plaintiffs.

225.    The Fiduciary Defendants breached their fiduciary duties by misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.

226.    Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, plaintiffs request that:

1. The defendants be ordered to:

    a.  Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the Plaintiffs' WBPs participants;

    b.  Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of the defendants' fiduciary duties; and

    c.  Make full restitution of all profits that the Plaintiffs' WBPs would have earned on the converted funds;

2.  Plaintiffs be awarded compensatory and exemplary damages in amounts to be determined together with attorneys fees, and costs; and

3.  Such other relief as the Court deems appropriate.

## COUNT VII – COMMON LAW KNOWING PARTICPATION IN AND AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### All Plaintiffs v. All Defendants

227.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 226 above as though set forth at length herein.

228.  Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, for common law knowing participation in and aiding and abetting breaches of fiduciary duty.

229.  Any of the defendants deemed not to be common law fiduciaries knowingly participated in and aided and abetted fiduciary breaches by PennMont, the Koresko Law Firm and Penn Public Trust.

230.  These breaches included misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.

231.  The misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, plaintiffs request that:

1.  The defendants be ordered to:

    d.  Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the Plaintiffs' WBPs participants;

  e. Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of the Fiduciary Defendants' fiduciary duties; and

  f. Make full restitution of all profits that the Plaintiffs' WBPs would have earned on the converted funds;

2. Plaintiffs be awarded compensatory and exemplary damages in amounts to be determined together with attorneys fees, and costs; and

3. Such other relief as the Court deems appropriate

## COUNT VIII– Negligence and Bad Faith
### All Plaintiffs v. American General

  232. Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 231 above as though set forth at length herein.

  233. Should it be determined that ERISA does not control this lawsuit or that American General is not a fiduciary within the meaning of ERISA, in permitting the Koresko Parties:

  a. To change the owners and beneficiaries of the policies without notifying or obtaining plaintiffs' consent;

  b. To borrow the cash value in plaintiffs' policies without notifying or obtaining plaintiffs' consent, and

  c. Refusing to adequately inform plaintiffs of the status of their insurance policies, American General acted with gross negligence and breached its obligations of good faith owed to plaintiffs and to the Plaintiffs' WBPs.

64

**WHEREFORE**, plaintiffs request judgment in their favor and against American General for compensatory and exemplary damages in an amount to be determined but in excess of $75,000.00

## COUNT IX – PROFESSIONAL MALPRACTICE
### All Plaintiffs v. Lee Phillips

234.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 233 above as though set forth at length herein.

235.    In connection with plaintiffs' decision to enter into the Arrangement and in connection with plaintiffs' continued participation in the Arrangement, Lee Phillips undertook an obligation to function as plaintiffs' financial advisor. Mr. Phillips also provided plaintiffs with legal representation and advice.

236.    Lee Phillips failed to exercise the standard of care applicable to his professions in advising plaintiffs and in representing plaintiffs' interests. This failure included:

    a.  Failing to conduct adequate due diligence as to the viability of the Arrangement and as to the adequacy of the documents purporting to memorialize the Arrangement;

    b.  Failing to advise and warn plaintiffs as to the various possible interpretations of the purposely ambiguous documentation;

    c.  Failing to disclose his financial interests in having plaintiffs enter the Arrangement;

    d.  Failing to adequately monitor the performance of the Arrangement or the performance of the Koresko Parties;

    e.  Failing to inform plaintiffs of the nature of governmental investigations of the Arrangement and how it was being operated; and

f.   Such other negligent conduct as may be uncovered through discovery.

237.   Plaintiffs have suffered severe financial harm as a consequence of Lee Phillips's malpractice.

**WHEREFORE**, plaintiffs request judgment in their favor and against Lee Phillips for compensatory and exemplary damages in an amount to be determined but in excess of $75,000.00

Respectfully submitted,

<u>**/s/ Ira B. Silverstein**</u>
Ira B. Silverstein

Michael R. Minkoff
(*pro hac vice* application for admission to be submitted)

Feldman Morgado, PA
140 Broadway
46th Floor, Suite 4624
New York, NY 10005

*Attorneys for Plaintiffs*

Dated:   Philadelphia, Pennsylvania
September 15, 2014